TRAVERSE CITY EDUCATION ASSOCIATION v TRAVERSE CITY
PUBLIC SCHOOLS

Docket No. 106982. Submitted February 8, 1989, at Lansing. Decided
July 6, 1989.

An election was held November 13, 1986, pursuant to a consent
agreement between respondent, the Traverse City Public
Schools, and the Michigan Educational Support Personnel Asso-
ciation to determine whether all aides, secretaries, clerks and
library media assistants regularly employed by the respondent
wished to be represented by the union. Robert Rixom, the
detention study hall supervisor, was considered by the respon-
dent to be an aide and was listed as an eligible voter. Rixom
voted in the election which resulted in union representation.
On January 27, 1987, petitioner, Traverse City Education Asso-
ciation, filed an accretion petition, seeking to accrete the posi-
tions of detention study hall supervisor and attendance officer
assistant to its existing unit of professionals. The Michigan
Employment Relations Commission issued an order on Febru-
ary 11, 1988, directing that the accretion election be held.
Respondent appealed and the Court of Appeals remanded the
case so that the MERC could resolve respondent's claim that
petitioner's accretion petition was untimely filed. *Traverse City
Ed Ass'n v Traverse City Public Schools,* unpublished opinion
per curiam of the Court of Appeals, decided April 24, 1989
(Docket No. 106982). The MERC, on remand, found that the
petition was timely filed.

The Court of Appeals *held:*

1. The MERC violated MCL 423.214; MSA 17.455(14) in order-
ing the accretion election despite the fact that the accretion
petition involved another bargaining unit since the petition
sought to add an employee who had previously voted in a valid
election within the preceding twelve-month period. Because the
accretion petition was filed more than sixty days before the

REFERENCES

Am Jur 2d, Labor and Labor Relations §§ 189-193, 234, 245, 660-
663.

See the Index to Annotations under Collective Bargaining; Labor
and Employment; Teachers and Instructors.

twelve-month period provided in the statute expired, it should have been dismissed as to the detention study hall supervisor.

2. The MERC erred in holding that the detention study hall supervisor and attendance officer assistant shared a community of interest with the professional employees of petitioner's bargaining unit. The MERC's decision was not supported by competent, material and substantial evidence on the whole record.

Reversed.

1. LABOR RELATIONS — BARGAINING UNITS — ELECTIONS — EMPLOY-
MENT RELATIONS COMMISSION.

The act regarding strikes by public employees provides that an election shall not be directed in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election was held; the Michigan Employment Relations Commission has followed a policy of dismissing a petition for an election filed more than sixty days prior to the expiration of the twelve-month period after an election (MCL 423.214; MSA 17.455[14]).

2. LABOR RELATIONS — EMPLOYMENT RELATIONS COMMISSION — BAR-
GAINING UNITS — ELECTIONS.

The Michigan Employment Relations Commission violated the provision of the act regarding strikes by public employees which provides than an election shall not be directed in any bargaining unit or any subdivision within which, in the previous twelve-month period, a valid election was held when it ordered an accretion election regarding a certain bargaining unit where the accretion petition sought to add an employee who had previously voted in a valid election involving another bargaining unit of the employer's employees within the preceding twelve-month period (MCL 423.214; MSA 17.455[14]).

3. LABOR RELATIONS — BARGAINING UNITS — EMPLOYMENT RELATIONS
COMMISSION — APPEAL.

The task of determining an appropriate bargaining unit is left to the Michigan Employment Relations Commission and its determination is a finding of fact which will not be overturned if supported by competent, material and substantial evidence on the whole record; assuming that the individuals are employees under the act, the MERC must determine whether the class of employees shares a community of interest such that representation by a single bargaining agent is appropriate.

4. LABOR RELATIONS — BARGAINING UNITS — NONTEACHING SCHOOL
PERSONNEL.

The presumptively appropriate bargaining unit of nonteaching

school personnel includes all nonprofessional personnel except clericals and aides.

*Reid & Reid* (by *Daniel J. Reid*), for petitioner.

*Thrun, Maatsch & Nordberg, P.C.* (by *James T. Maatsch* and *Martha J. Marcero*), for respondent.

Before: GILLIS, P.J., and SULLIVAN and GRIFFIN, JJ.

PER CURIAM. Respondent appeals as of right from the Michigan Employment Relations Commission's decision directing an accretion election to be held. *Traverse City Public Schools v Traverse City Ed Ass'n,* 1988 MERC Lab Op 132. The in-school suspension supervisor (hereinafter the detention study hall supervisor) and attendance officer assistant were to decide whether they wished to be represented by the petitioner, which represented respondent's teaching (i.e., professional) employees. We initially remanded this case so that the MERC could resolve respondent's claim that petitioner's accretion petition was untimely filed. *Traverse City Ed Ass'n v Traverse City Public Schools,* unpublished opinion per curiam of the Court of Appeals, decided April 24, 1989 (Docket No. 106982). The MERC having resolved that issue, we now reverse.

On November 13, 1986, an election was held pursuant to a consent agreement to determine whether "all aides, secretaries, clerks, library media assistants regularly employed by" respondent wished to be represented by the Michigan Educational Support Personnel Association. Respondent considered Robert Rixom, the detention study hall supervisor, an aide and listed him as an eligible voter in the November 13 election. Rixom voted in the election which resulted in union representation.

On January 27, 1987, petitioner filed an accretion petition, seeking to accrete the positions of detention study hall supervisor and attendance officer assistant to its existing unit of professionals. The order directing the election was issued on February 11, 1988.

Respondent claims that MCL 423.214; MSA 17.455(14) barred petitioner's accretion petition as to the detention study hall supervisor. MCL 423.214; MSA 17.455(14) provides in part:

> An election shall not be directed in any bargaining unit or any subdivision within which, in the preceding 12-month period, a valid election was held.

Respondent notes that the purpose of this section is to ensure stability and argues that petitioner should not be able to file a petition seeking to accrete an individual, who has within the year voted in a representation election without challenge, to another bargaining unit.

Petitioner argues that MCL 423.214; MSA 17.455(14) does not apply because the election was not directed in the same bargaining unit and, in any event, notes that the election was directed on February 11, 1988, over a year after the November 13, 1986, election was held.

In *Lansing Community College v Lansing Community College Faculty Ass'n,* 1979 MERC Lab Op 1180, the petitioner filed an accretion petition on December 21, 1978, and an election was held on February 20, 1979. The individuals who voted in that election were unrepresented nonsupervisory faculty in the airframe and flight sections of the aviation technology program. On February 27, 1979, the petitioner filed another accretion petition, seeking to add two other individuals to the

unit. Subsequently, the petitioner decided to proceed with its petition as to only one of these individuals. That individual had not voted in the prior accretion election because the parties could not agree on his status.

The respondent claimed that the accretion petition was barred pursuant to MCL 423.214; MSA 17.455(14) because an accretion petition had been filed within the previous year among the same nonsupervisory employees. *LCC, supra* at 1184. Noting that the purpose of MCL 423.214; MSA 17.455(14) was to relieve an employer from the burden of defending multiple petitions in a given bargaining unit within a twelve-month period so that some stability in labor relations might be achieved, the MERC agreed.

In *Rockford v Service Employees International Union, Local 586,* 1980 MERC Lab Op 459, a representation petition was filed on August 10, 1979. In September of 1979, the parties signed an election consent agreement which excluded the assistant water plant superintendent from the employees eligible to vote in the election. The election was held on October 4, 1979, and the petitioner was certified as the employees' representative on October 15, 1979. The petitioner filed a unit clarification petition seeking to add the assistant water plant superintendent to its bargaining unit. The MERC held that to entertain the petition for unit clarification during the certification year would interfere with labor relations stability and thwart the utility of the device of consent election. *Id.* at 465. The MERC noted that it was acceptable practice for the parties to agree that certain classifications will vote challenged ballots, with the understanding that the MERC will determine their inclusion or exclusion after the election. *Id.* at 464, n 2.

In *Kingsley/Traverse City Adult Ed Consortium v Michigan Federation of Teachers,* 1988 MERC Lab Op 118, the petitioner filed an accretion petition three months after a consent election agreement was signed, seeking to accrete two positions to the bargaining unit which had been expressly excluded therefrom pursuant to the consent election agreement. The petitioner agreed to exclude the positions because it did not want to hold up the election, but indicated that it would file an accretion petition if it was certified as the unit's bargaining representative.

The MERC held that the petitioner had the opportunity to litigate the supervisory status of the two positions it sought to accrete and that petitioner's agreement to exclude the positions from the bargaining unit precluded it from seeking to represent those employees for a period of twelve months after the date of election. While the MERC noted that more than twelve months had passed since the election, it followed its policy of dismissing a petition filed more than sixty days prior to the expiration of the twelve-month period after an election. *Id.* at 122.

On remand in this case, the MERC distinguished *Lansing Community College* and *Rockford* because those cases involved the petitioner's attempt to add employees to a bargaining unit from which it had previously agreed to exclude them. The instant case involves petitioner's attempt to accrete an individual who had earlier voted in an election involving one bargaining unit to another bargaining unit. The MERC also noted that the parties' earlier consent election agreement did not specifically include the detention study hall supervisor by title and that the petitioner's failure to challenge Rixom's inclusion in the voting list was not sufficient to establish that the parties had an

agreement to include his position in the aides' unit. The MERC also noted that the record did not show that that position had ever been part of the aides' unit. Hence, the MERC concluded that an accretion election would not constitute an election in the bargaining unit or subdivision thereof in which the previous election was conducted and, therefore, was not untimely pursuant to MCL 423.214; MSA 17.455(14).

We disagree. The record demonstrates that respondent classified the detention study hall supervisor as an aide. While Rixom's title was not specifically listed in the consent election agreement, Rixom did vote in the election without objection. Hence, we hold that the MERC did violate MCL 423.214; MSA 17.455(14) when it ordered an accretion election despite the fact that the accretion petition involved another bargaining unit when that accretion petition sought to add an employee who had previously voted in a valid election within the preceding twelve-month period. Because the accretion petition was filed more than sixty days before the twelve months expired, it should have been dismissed as to the detention study hall supervisor. *Kingsley/Traverse City Adult Ed Consortium, supra,* p 122. Compare *Michigan Educational Support Personnel Ass'n v Southfield Public Schools,* 148 Mich App 714, 719-720; 384 NW2d 768 (1985).

Respondent next claims that the MERC erred when it held that the detention study hall supervisor and attendance officer assistant shared a community of interest with the professionals in the petitioner's bargaining unit. We note that we will address respondent's claim as to the detention study hall supervisor even though our decision on the first issue technically relieves us of the need to do so.

Jerry Glenn, respondent's high school assistant principal in charge of the attendance office and detention facilities, testified that initially he and his secretary kept track of tenth-grade attendance and notified parents of problems. In the 1980s, three secretaries, one for each grade, were hired to keep track of attendance. The secretaries reported to three teachers, who each worked in the attendance office for two hours of the day in addition to their regular teaching duties. Eventually, it was realized that a teacher was not required for the position and that having one person in charge would eliminate inconsistencies in policy administration. Glenn testified that the attendance officer assistant's job is to administer the attendance policy.

The attendance officer assistant's job description states that his duties include: (1) talking with students about attendance problems, (2) determining the cause thereof, (3) taking appropriate action, including listening, counseling, referring to a counselor, contacting parents and arranging a conference, referring to outside counseling, or referring to the appropriate assistant vice-principal, and (4) maintaining a log of student contacts.

William Bryant, the attendance officer assistant, testified that his job includes counseling students on their attendance, reprimanding them if they do not attend classes regularly, giving out detentions for skipping school, assigning students to detention study hall if they are dropped from classes and coordinating with counselors and administrators.

Bryant is certified to teach social studies, English, physical education and driver's training, even though the attendance officer assistant's position does not require certification. In fact, only some college-level training is required. Bryant earns less than a regular teacher and has attended

only one faculty meeting. Bryant works from 7:30 A.M. until 4:00 P.M., while regular teachers work from 7:45 A.M. until 3:30 P.M.

Bryant admitted that the secretaries handle the first two unexcused absences from a class by notifying the student's parents by mail. When a student receives three unexcused absences, Bryant is notified. Bryant then contacts the student and his or her parents and warns them that the student is in danger of being dropped from a class. After the fourth unexcused absence, Bryant notifies the student and the parents and the student is assigned to detention study hall. The student's teacher and counselor are also notified. Appeals may be made to the administration.

Bryant also claimed that he sometimes has the authority to allow parents to excuse an absence after 3:00 P.M. and that he advises counselors as to whether older students, who were removed from classes, could begin their day one hour later or end their day one hour earlier. Bryant talks to approximately twenty students each day.

Glenn claimed that it was the appropriate vice-principal's decision whether a student began his day later or ended it earlier in lieu of detention study hall.

The task of determining an appropriate bargaining unit is left to the MERC and its determination is a finding of fact which will not be overturned if supported by competent, material and substantial evidence on the whole record. *Michigan Educational Support Personnel Ass'n, supra,* pp 716-717. Assuming that the individuals are employees under the act, the MERC must determine whether the class of employees shares a community of interest such that representation by a single bargaining agent is appropriate. *Id.* (quoting *Food Store Employees Union, Local 347, Amalgamated Meat Cut-*

*ters & Butcher Workmen of North America v National Labor Relations Bd,* 137 US App DC 248, 252; 422 F2d 685, 689 [1969]). The presumptively appropriate bargaining unit of nonteaching school personnel includes all nonprofessional personnel except clericals and aides. *Morley Stanwood Community Schools v Michigan Ed Ass'n,* 1985 MERC Lab Op 752; *Lansing School Dist v Michigan Council 11, American Federation of State, County & Municipal Employees, AFL-CIO,* 1981 MERC Lab Op 232.

In *Detroit Bd of Ed v Detroit Federation of Teachers, Local 231, AFT, AFL-CIO,* 1977 MERC Lab Op 1000, the petitioner sought to accrete assistant attendance officers to its existing collective bargaining unit of teachers and others, including attendance agents. Attendance agents were required to have a bachelor's degree, with emphasis on social work, child counseling, psychology and community relations among others, as well as two years experience in either social work, guidance counseling or employment having contact with school-age children. The attendance agents investigated absences and social problems causing absences, worked with parents and utilized other social services to resolve a student's attendance problem.

An assistant attendance officer was in the position below the attendance agent. *Id.* at 1002. Assistant attendance officers were required to have one year of college. They investigated pupil absences referred by teachers and did have some contact with parents. If the assistant attendance officer could not contact a student's parents or if he discovered that work had to be done with the parents, the case was referred to the attendance agent.

The MERC held that the assistant attendance

officers should not be accreted to the professional teaching unit because it had a long-standing policy of not including nonprofessionals in a bargaining unit of professionals. *Id.* at 1003. Likewise, the MERC noted that the bargaining unit consisted of degreed professionals while the assistant attendance officers were only required to meet minimal education requirements. *Id.* Finally, the MERC noted that assistant attendance officers were not "functioning in either the full professional manner of the teaching profession or of the attendance agents." *Id.*

In *Copper Country Intermediate School Dist v Michigan Educational Support Personnel Ass'n,* 1979 MERC Lab Op 666, the petitioner, which represented nonprofessional personnel, sought to take over representation of an attendance officer, among others, who was represented by another union, which also represented nonprofessional personnel. There were separate unions for teachers and nonprofessional personnel. The employer objected to including the attendance officer in a nonprofessional personnel group, claiming that that position was professional in nature. The attendance officer had historically been included in the nonprofessional personnel unit. The attendance officer worked with local school districts on attendance problems with students and dealt with parents, principals and the probate court. No special education was required and the present attendance officer was not certified and had not had any professional training for that position. The MERC held that the attendance officer was properly in the nonprofessional personnel unit because there were no special education requirements for the position and he did not function "as a professional or in a capacity which would set him apart from others" in his bargaining unit. *Id.* at 669.

In *Kingston Community Schools v Michigan Ed Ass'n,* 1987 MERC Lab Op 740, the petitioner filed a unit clarification petition seeking a determination of whether a staff specialist should be included in its bargaining unit of teachers, librarians and counselors. The employer claimed that the staff specialist's duties were administrative and not teaching duties.

From 1981 until 1983, the employer assigned a teacher to supervise students at lunch hour and a secretary kept attendance records. *Id.* at 741. In August of 1983, the employer posted an opening for a staff specialist to take over the noontime duties. The staff specialist also had to: (1) keep school attendance records, (2) contact truants' homes, (3) conduct student and parental conferences regarding attendance, (4) assist the principal with discipline by conducting conferences, recommending discipline, and closing classes for disciplinary reasons, and (5) investigate and enroll new students. The staff specialist position was initially filled by a teacher who was given release time to perform those duties. The teacher worked as a staff specialist one hour each day in the 1984-85 school year and two hours each day in the 1983-84 and 1985-86 school years. The staff specialist received a teacher's pay and fringe benefits. In the 1983-84 school year, another teacher supervised the students at lunch hour and, thereafter, an aide did so.

In 1985, the employer claimed that the staff specialist was an administrative position and the petitioner filed a unit clarification petition. The petitioner noted that the staff specialist had duties similar to those of a teacher or a counselor.

The MERC held that the staff specialist had a community of interest with the teachers' bargaining unit, noting: (1) the staff specialist received the

same salary and benefits and worked the same hours as the teachers, (2) the staff specialist's responsibilities were integrated with the teacher's responsibilities and the staff specialist had regular contact with teachers, (3) the staff specialist's position was filled by a professional employee with a teacher's certificate, and (4) the staff specialist used his professional skills in dealing with students and parents.

In the instant case, the MERC did not mention *Detroit Bd of Ed* or *Copper Country Intermediate School Dist* and, instead, relied on *Kingston Community Schools* in holding that the attendance officer assistant shared a community of interest with the teachers' union. In particular, the MERC noted that no other union sought to represent that employee.

Given the facts previously discussed, we disagree and believe that *Kingston Community Schools* is readily distinguishable on its facts and that the principles in *Detroit Bd of Ed and Copper Country Intermediate School Dist* are more applicable here. Thus, we hold that the MERC's decision that the attendance officer assistant shared a community of interest with petitioner's bargaining unit was not supported by competent, material and substantial evidence on the whole record and, therefore, must be reversed.

We now turn to the issue of whether the MERC's decision that the detention study hall supervisor shared a community of interest with the bargaining unit represented by petitioner was supported by competent, material and substantial evidence on the whole record.

Glenn testified that respondent decided to have an in-school suspension policy rather than to suspend its students outside of the school. The benefit of in-school suspension was that the student, who

was out of his regular classes, would complete his required work in a separate area and turn it in at the end of the day for credit.

The program was subsequently revised so that a student who received four unexcused absences or who otherwise was dropped from a class would be assigned to detention study hall for the remainder of the year. The detention study hall supervisor's duties were: (1) to maintain a controlled, disciplined-type atmosphere, (2) to develop a relationship of respect and trust with the students assigned to detention study hall, (3) to administer the rules established for detention study hall firmly, fairly and consistently, (4) to provide general assistance with classroom assignments, (5) to take attendance, (6) to refer discipline problems to the appropriate assistant principal, and (7) to keep statistics as to attendance in the before- and after-school detention program.

Rixom, the present detention study hall supervisor, testified that there are three types of study halls: (1) before- and after-school detentions, imposed as punishment, (2) detention study halls, and (3) regular study halls. Before-school detentions are held from 7:20 to 8:10 A.M. and after-school detentions from 3:10 to 4:00 P.M. A student is assigned to regular study hall at the beginning of the year; detention study hall is assigned as a student is dropped from a class for whatever reason, including excessive unexcused absences. Rixom has detention study halls for four hours each day. Rixom has one hour free and supervises the cafeteria for one hour during lunch. The students in fourth- and fifth-hour detention study halls are handled by a regular teacher in combination with his regular study hall class. Moreover, part of the sixth-hour detention study hall is assigned to the regular study hall teacher because

Rixom may also be running after-school detention at that time.

Rixom takes roll, keeps order and helps students with homework, excluding math, or other problems if requested. Rixom does not give assignments and there is no credit for detention study hall. Those in detention study hall may sleep or engage in any other nondisruptive activity.

Rixom is certified to teach from kindergarten to eighth grade and driver's training. He concedes that he is not certified to teach at the high-school level and that certification was not required for him to obtain his present position. In fact, only a high school diploma was required. We note that if Rixom was absent, a substitute teacher was initially called; however, lately a substitute from the aide pool has taken over.

Rixom does not attend faculty meetings because before-and after-school detention are held at those times. Rixom works from 7:15 A.M. until 4:15 P.M., while teachers work from 7:45 A.M. until 3:30 P.M. Rixom earns much less than a teacher.

In *Niles Community Schools v Niles 5-C Ed Ass'n, MEA/NEA,* 1984 MERC Lab Op 327, the petitioner sought to accrete the newly-created position of behavior management specialist to its unit of teachers and other professional employees. The employer initially planned to have two teachers supervise a behavior classroom, which was to be set aside for disciplinary purposes in lieu of outside suspension. Later, the employer opted to hire someone with previous experience with troubled youth and who had taken college-level courses in behavioral sciences. A teaching certification was not required, but helpful. Eventually, the employer hired an individual who had teaching licenses from Indiana and Illinois, but not Michigan.

The behavior management specialist monitored

the behavior of students assigned to his room. *Id.* at 329. The students were to conform with rules devised by the executive director of instruction. The behavior management specialist did not make academic assignments, but evaluated a student's compliance with the room's rules; however, he did make assignments of rote exercises to keep students busy before they received assignments from their regular teachers. Two teachers were assigned to the behavior room to assist students with the academic assignments made by their regular teachers. The behavior management specialist's salary was lower than a teacher's salary and closer to an aide's salary.

The MERC noted that, while it will not place paraprofessional employees in the same unit as professional employees, it is not bound by statute to do so. *Id.* at 330. The MERC also noted that the behavior management supervisor's lack of a Michigan teaching certificate was not dispositive. The MERC concluded:

> What is more significant in the present case than the presence or lack of a teaching certificate is the fact that the position effectively requires the instructional and student-supervisory abilities usually associated with the teaching profession. The job involves professional teaching skills, as evidenced by the original intention to use bargaining unit members in this role and by the fact that the person hired had qualifications substantially equivalent to those of a certificated teacher and has performed professional level teaching assignments, such as evaluating student behavior. In addition, no other union is available or is seeking to represent this employee. We conclude on these facts that the Behavior Room Supervisor shares a community of interest with the professional teaching unit currently represented by the Petitioner and should be added to that unit. [*Id.*]

In *Benton Harbor Area Schools v North Berrien Co Ed Ass'n, MEA/NEA,* 1984 MERC Lab Op 904, the petitioner filed a unit clarification petition seeking to add the position of in-house suspension monitor to its bargaining unit of professional certified personnel, including teachers, social workers and counselors. Students were assigned to the in-house suspension room for minor infractions requiring discipline outside of their regular classroom for one- to ten-day periods. The principal or assistant principal determined which students would be sent to in-house suspension and the length of the student's stay. While in in-house suspension, the student's regular teachers provided assignments which were distributed and collected by the in-house suspension monitor. When the student's regular teacher did not make assignments, the in-house suspension monitor gave the student an assignment to keep him busy. Although the in-house suspension monitor's supervisor testified that the in-house suspension monitor was not supposed to help students with assignments, but should instead refer them to the teacher making the assignment, the in-house suspension monitor's job description included providing assistance with assignments and he did so.

The in-house suspension monitor's job description included: (1) maintaining order and quiet and ensuring that the students did not leave the room without permission, (2) reinforcing good behavior, (3) providing and maintaining a structured learning environment, (4) preventing behavior problems, (5) working closely with principals and counselors to extinguish negative behavior, and (6) maintaining a daily record of the student's positive and negative behavior. *Id.* at 906-907. The in-house suspension monitor, with the approval of the principal, created a contract form for students to agree

to modifying their behavior. The in-house suspension monitor's disciplinary authority was similar to a teacher's and when he was absent from work a substitute teacher was assigned. A state teaching certificate was not required, although two years of college education was. The present in-house suspension monitor was a certified teacher and had held a similar position in another school district.

The MERC held that the in-house suspension monitor shared a community of interest with the petitioner's professional bargaining unit, noting: (1) the principal supervised this position as he did the other members of the bargaining unit, (2) the in-house suspension monitor had regular contact with other teachers and his function was integrated with the teachers' and counselors' function of dealing with student discipline, (3) the lack of a teaching certificate or professional degree was not dispositive when substantial similarities existed between the in-house suspension monitor's skills and responsibilities and those of the petitioner's bargaining unit (i.e., to provide limited instruction and make a professional contribution to the personal development of students in the in-house suspension room), and (4) no other union sought to represent the in-house suspension monitor. *Id.* at 908-909.

In this case, the MERC noted the similarities and the differences between the detention study hall supervisor's duties and the duties of the employees at issue in *Niles Community Schools and Benton Harbor Area Schools.* It then held that the detention study hall supervisor did share a community of interest with the professional unit because: (1) he was expected to make a contribution to the nonacademic personal development of students which required skills and entailed responsibilities which approached those required of degreed pro-

fessionals like teachers and counselors, (2) the employer hired a degreed and certified individual for the position, even though one was not required, and (3) no other union sought to represent the detention study hall supervisor, a relevant consideration when determining where an employee should be placed in borderline cases.

We disagree. First, the Michigan Educational Support Personnel Association was the detention study hall supervisor's union because he had participated in its representation election. Second, the detention study hall supervisor was not certified to teach in high school, but only from kindergarten through eighth grade and driver's education. Moreover, the original in-house suspension supervisor was not certified. Finally, unlike the behavior management specialist and in-house suspension monitor, the detention study hall supervisor's duties were simply to supervise and maintain order among students who had been expelled from regular classes, not unlike the detention study hall supervisor's duties in the cafeteria, which we note were the same duties performed by an aide in *Kingston Community Schools.*

Given our discussion of the detention study hall supervisor's duties, we hold that the MERC's decision that the detention study hall supervisor shared a community of interest with petitioner's professional employees was not supported by competent, substantial and material evidence upon the whole record. Consequently, the MERC's order directing an election is reversed.

Reversed.